DONALD RAY LUMLEY, EMPLOYEE, PLAINTIFF v. DANCY CONSTRUCTION COMPANY, INC., EMPLOYER AND INA/AETNA INSURANCE COMPANY, CARRIER, DEFENDANTS

No. 8510IC742

(Filed 4 February 1986)

Master and Servant § 68— workers' compensation—scarring of arteries in wrists— occupational disease

The evidence supported determinations by the Industrial Commission that adventitial scarring to the ulnar arteries in both wrists suffered by a carpenter's helper who regularly used a jackhammer in demolition work constituted an occupational disease within the meaning of N.C.G.S. 97-53(13) and that this disease was caused by plaintiff's employment with defendant.

APPEAL by defendants from an Opinion and Award of the Industrial Commission. Opinion and Award entered 12 February 1985. Heard in the Court of Appeals 5 December 1985.

Plaintiff brought this action seeking to recover workers' compensation for temporary total disability, permanent partial disability and disfigurement caused by adventitial scarring to the ulnar arteries in both wrists. Plaintiff contends the scarring was the result of an occupational disease contracted during his em-

ployment as a carpenter's helper with the defendant Dancy Construction Company.

On 22 May 1984, this matter was heard by Deputy Commissioner Morgan R. Scott. Commissioner Scott entered an opinion and award which contained the following pertinent findings of fact and conclusions of law:

FINDINGS OF FACT

1. Plaintiff began working for defendant-employer in 1977 as a carpenter's helper. He worked at the Baptist Hospital location until 1980. His job involved regular use of a jackhammer for demolition work although he would not necessarily operate it on a daily basis. When he did operate it, he would activate it by applying pressure on the handles with both hands. The jackhammer operated by use of compressed air and was used to break up concrete and other structures. It would jerk plaintiff's hands and body when he used it, and he used it for periods of 20 to 60 minutes. The workers rotated jobs so that no one would have to use the jackhammer all day. Plaintiff's job duties also included running drills and using a sledgehammer.

2. Several months after plaintiff began working for defendant-employer, he began to experience numbness and pain in his hands and wrists after using the jackhammer or screwing screws. He continued to have problems and his hands would be numb even before starting work, but he did not seek medical attention. In April 1982 he was assigned to work at the Hanes Plant where the crew was tearing down a wall. The burning and numbness became so severe that he found it difficult to hold onto objects. In June he went to Dr. Chandler who referred him to Dr. Koman, an orthopaedic surgeon.

3. Dr. Koman admitted plaintiff to the hospital on November 15, 1982 and performed tests which indicated that there was constriction of the ulnar arteries in both hands. He performed surgery and found adventitial scarring of both arteries which he stripped. The blood flow was improved by the procedure and plaintiff was discharged on November 18. On January 5, 1983, plaintiff informed Dr. Koman that he had

just returned to work but he had developed swelling behind the scar. Dr. Koman advised him not to work for one more month. There is no evidence as to whether plaintiff was able to do his regular job at the close of that month period. When he next saw Dr. Koman on May 23, 1983, he was complaining of more problems in his right hand. Dr. Koman restricted him to light work and admitted him to the hospital in July for additional surgery to resect the artery which had thrombosed. He was released to light work on October 1, 1983 and was discharged to regular work on November 14, 1983.

4. As a result of the repetitive trauma to his hands while operating the jackhammer and using sledgehammers, plaintiff developed adventitial scarring to the ulnar arteries in both wrists. This scarring is caused by repetitive or singular trauma to the palm of the hand and causes constriction of the artery. Plaintiff was placed at an increased risk of developing adventitial scarring by reason of his employment as compared to the general public not so exposed. The thrombosis which subsequently developed was also causally related to the scarring and his employment.

5. Plaintiff contracted adventitial scarring to the ulnar nerves in both wrists, an occupational disease which is characteristic of and peculiar to his particular employment and which is not an ordinary disease of life to which the general public is equally exposed.

6. As a result of said occupational disease, plaintiff was temporarily totally disabled from an unknown date in September 1982 through February 6, 1983 except for approximately two days when he did work. He was also temporarily totally disabled from May 23 through November 13, 1983. Defendant-employer did not offer him suitable work during the periods when he was only released to light work. He reached maximum medical improvement on November 14, 1983.

7. As a result of the aforesaid occupational disease, plaintiff sustained a 10% permanent partial disability to his right hand and a 5% permanent partial disability to his left hand.

8. As a result of the aforesaid occupational disease and subsequent surgery, plaintiff sustained permanent bodily disfigurement described as follows:

> Plaintiff has a scar which runs from his right palm over the wrist onto his forearm. From the wrist it extends approximately three inches towards the elbow. The scar is redder than the surrounding skin. Approximately one-half of the scar is up to one-half inch in width and appears to be slightly depressed and the remainder of the scar appears to be raised, darker than the other scarring and approximately one-fourth inch in width.

9. Plaintiff is thirty-one years old and has a tenth grade education. He has had no special work training. His employment history includes working for a furniture company, delivery work for a bottling company as well as construction work where his primary experience lies. He is presently employed on a part-time basis in the shipping department of a furniture company.

10. As a result of the aforesaid occupational disease, plaintiff has sustained permanent bodily disfigurement which mars his appearance to such an extent that it may reasonably be presumed to lessen his future opportunities for remunerative employment and so reduce his future earning capacity. The fair and equitable amount of compensation for said disfigurement under the Workers' Compensation Act is $150.00.

11. Plaintiff's average weekly wage was $171.98.

Based upon the foregoing stipulations and findings of fact, the undersigned makes the following:

### CONCLUSIONS OF LAW

1. Plaintiff contracted adventitial scarring to the ulnar arteries in both of his wrists, an occupational disease which is characteristic of and peculiar to his employment with defendant-employer and which is not an ordinary disease of life to which the general public is equally exposed. G.S. 97-53(13); *Booker v. Duke Medical Center*, 297 N.C. 348 (1979).

2. Plaintiff is entitled to compensation at the rate of $114.65 per week for the period of temporary total disability

he sustained as a result of this occupational disease. This period of temporary total disability is uncertain but it includes the periods from October 1, 1982 through February 6, 1983, except for two days when he worked, and from May 23 through November 13, 1983. G.S. 97-29.

   3. Plaintiff is entitled to compensation at the rate of $114.65 per week for 30 weeks for the 10% permanent partial disability he sustained to his right hand and the 5% permanent partial disability he sustained to his left hand as a result of this occupational disease. G.S. 97-31(12) and (19).

   4. Plaintiff is entitled to compensation in the amount of $150.00 for the permanent bodily disfigurement he sustained as a result of this injury by accident. G.S. 97-31(22).

Based upon these conclusions the deputy commissioner awarded benefits. From this award the defendants appealed to the Commission. On 12 February 1985, the Commission affirmed the opinion and award of the deputy commissioner, and the defendants appealed.

   *Petree, Stockton, Robinson, Vaughn, Glaze & Maready, by Robert J. Lawing and Jane C. Jackson, for defendant appellants.*

   *Yokley & Teeter, by D. Blake Yokley, for plaintiff appellee.*

ARNOLD, Judge.

The defendants argue that "plaintiff Lumley cannot recover benefits under the North Carolina Workers' Compensation Act because he does not suffer from an occupational disease which is characteristic of and peculiar to his employment as a carpenter's helper." We disagree.

An occupational disease is defined by G.S. 97-53(13) as:

Any disease, other than hearing loss covered in another subdivision of this section, which is proven to be due to causes and conditions which are characteristic of and peculiar to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment.

Defendants argue plaintiff failed to meet two of the requirements set forth in the statute.

First they argue that plaintiff failed to present any evidence to support the Commission's finding that adventitial scarring of the ulnar arteries is peculiar to the occupation of carpenter's helper. In *Booker v. Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979), our Supreme Court set forth the test for determining whether a disease was "characteristic of and peculiar to" a trade or profession. Chief Justice Sharp, writing for the Court, stated:

A disease is "characteristic" of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. *See Harman v. Republican Aviation Corp.*, 298 N.Y. 285, 82 N.E. 2d 785 (1948). Appellees argue, however, that serum hepatitis is not "peculiar to" the occupation of laboratory technicians since employees in other occupations and members of the general public may also contract the disease.

Statutes similar to G.S. 97-53 have been examined by the court of many states. Conn. Gen. Stat. § 5223, for example, defined an occupational disease as "a disease peculiar to the occupation in which the employee was engaged and due to causes in excess of the ordinary hazards of employment as such." (Current version at Conn. Gen. Stat. Ann. 31-275 (West 1972). In *Lelenko v. Wilson H. Lee Co.*, 128 Conn. 499, 503, 24 A. 2d 253, 255 (1942) that statute was construed as follows:

"The phrase, 'peculiar to the occupation,' is not here used in the sense that the disease must be one which originates exclusively from the particular kind of employment in which the employee is engaged, but rather in the sense that the conditions of that employment must result in a hazard which distinguishes it in character from the general run of occupations (see Oxford Dictionary; Funk & Wagnalls Dictionary) . . . . To come within the definition, an occupational disease must be a disease which is a natural incident of a particular occupation, and must attach to that occupation a hazard which distinguishes it from the usual run of occupations and is in excess of that attending employment in general. *Glodenis v. American Brass Co.*, 118 Conn. 29, 40, 170 A. 146, 150."

In *Ritter v. Hawkeye-Security Insurance Co.*, 178 Neb. 792, 795, 135 N.W. 2d 470, 472 (1965) the Nebraska Supreme

Court examined a statute almost identical to our own. *See* Neb. Rev. Stat. § 48-151 (1974). In upholding a disability award to a dishwasher who developed contact dermatitis as a result of the use of cleansing chemicals in his work, the court made the following remark:

"The statute does not require that the disease be one which originates exclusively from the employment. The statute means that the conditions of the employment must result in a hazard which distinguishes it in character from employment generally."

Similarly, in allowing an award to a nurse's aide who contracted tuberculosis from her patients, the Supreme Court of Maine in *Russell v. Camden Community Hospital*, 359 A. 2d 607, 611-12 (Me. 1976) said:

"The requirement that the disease be 'characteristic of or peculiar to' the occupation of the claimant precludes coverage of diseases contracted merely because the employee was on the job. For example, it is clear that the Law was not intended to extend to an employee in a shoe factory who contracts pneumonia simply by standing next to an infected coworker. In that example, the employee's exposure to the disease would have occurred regardless of the nature of the occupation in which he was employed. To be within the purview of the Law, the disease must be so distinctively associated with the employee's occupation that there is a direct causal connection between the duties of the employment and the disease contracted."

Courts in other jurisdictions have likewise rejected the proposition that a particular illness cannot qualify as an "occupational disease" merely because it is not unique to the injured employee's profession. *Young v. City of Huntsville*, 342 So. 2d 918 (Ala. Civ. App. (1976) ), *cert. denied*, 342 So. 2d 924 (Ala. 1977); *Aleutian Homes v. Fischer*, 418 P. 2d 769 (Alas. 1966); *State ex rel. Ohio Bell Telephone Co. v. Krise*, 42 Ohio St. 2d 247, 327 N.E. 2d 756 (1975); *Underwood v. National Motor Castings Division*, 329 Mich. 273, 45 N.W. 2d 286 (1951).

*Id.* at 472-474, 256 S.E. 2d at 198-199. In response to the defendants' argument in *Booker* that the disease in question was an or-

dinary disease of life which the general public could contract, Chief Justice Sharp further stated:

> Clearly, serum hepatitis *is* an "ordinary disease of life" in the sense that members of the general public may contract the disease, as opposed to a disease like silicosis or asbestosis which is confined to certain trades and occupations. Our statute, however, does not preclude coverage for all ordinary diseases of life but instead only those "to which the general public is *equally exposed* outside of the employment." G.S. 97-53(13) (emphasis added).
>
> . . . .
>
> As the Michigan Supreme Court observed when faced with a similar argument in *Mills v. Detroit Tuberculosis Sanitarium*, 323 Mich. 200, 209, 35 N.W. 2d 239, 242 (1948): "[T]he statute does not place all ordinary diseases in a non-compensable class, but, rather those 'to which the public is generally exposed outside of the employment.' The evidence in this case indicates that the plaintiff was exposed in his employment to the risk of contracting tuberculosis in a far greater degree and in a wholly different manner than is the public generally." The greater risk in such cases provides the nexus between the disease and the employment which makes them an appropriate subject for workman's compensation.

*Id.* at 475, 256 S.E. 2d at 200.

In their brief defendants seem to argue that the test set forth by our Supreme Court was modified by our opinion in *Keller v. City of Wilmington*, 65 N.C. App. 675, 678, 309 S.E. 2d 543, 545 (1983), *disc. rev. allowed*, 310 N.C. 625, 315 S.E. 2d 690 (1984) (appeal withdrawn upon settlement May 1984), in which we stated that the Commission improperly awarded compensation to the plaintiff for phlebitis because that occupation was "not peculiar to the occupation of patrol officer, but rather is peculiar to all occupations which require a great deal of sitting whether the profession be that of a secretary, judge or airline pilot." It is well settled that this Court may not overrule nor modify decisions of the Supreme Court of North Carolina. *See, Cannon v. Miller*, 313 N.C. 324, 327 S.E. 2d 888 (1985). Thus, any language in *Keller* which might be interpreted as defining the language "peculiar to"

differently than was set forth in *Booker* is ineffective and should have no precedential value.

An examination of the transcript of the proceeding reveals the following evidence to support the Commission's finding that adventitial scarring of the ulnar arteries is an occupational disease within the meaning of G.S. 97-57(13). Dr. Louis Andrew Koman, an orthopedic surgeon, gave the following competent testimony:

Q. Okay, what I'm getting at, Doctor, is, as opposed to an ordinary disease of life in which the general public is equally exposed outside of an employment, is ulnar artery thrombosis more characteristic and peculiar to a trade that involves the repetitive trauma to the palm area of the hand?

A. Yes.

This evidence is sufficient to meet the test set forth in *Booker* for determining whether a disease meets the "peculiar to" requirement set forth in the statute. Thus, we find the Commission properly determined that plaintiff suffered from an occupational disease within the meaning of G.S. 97-57(13).

Defendants also argue the plaintiff failed to produce sufficient competent evidence to establish a causal link between his employment and the contraction of the occupational disease. In reviewing an award of the Industrial Commission it is well established that this Court does not weigh the evidence but may only determine whether there is evidence in the record to support the findings of the Commission. If there is any evidence which directly or by reasonable inference tends to support the findings, this Court is bound by such evidence, even though there is evidence that would have supported a finding to the contrary. *Porterfield v. RPC Corp.*, 47 N.C. App. 140, 266 S.E. 2d 760 (1980).

In occupational disease cases the causal connection between the disease and the employee's occupation must of necessity be based upon circumstantial evidence. *Booker v. Medical Center*, 297 N.C. 458, 256 S.E. 2d 189 (1979). There is evidence in the record which shows that before plaintiff went to work for Dancy Construction Company he had not had any problem with his hands or wrists, neither had he seen a physician about such prob-

lems prior to going to work for Dancy. The evidence further showed that after plaintiff started operating a jackhammer and other pneumatic tools he began to notice a lot of burning sensation in his hands and wrists and that sometimes his hands would get numb. The evidence further shows that because of these problems plaintiff was referred to Dr. Koman. Dr. Koman gave the following pertinent evidence regarding the causation question:

Q. Well, in the case of Donald Lumley, do you have an opinion satisfactory to yourself, to a degree of reasonable certainty, based on the hypothetical facts that I gave you, assuming the hearing officer should find those to be the facts, as to whether or not the repetitive use of the jackhammer and other pounding by the hands in the construction laborer — or by a construction laborer could or might have caused the ulnar artery thrombosis—

—In this case?

THE WITNESS: I'm not sure whether yes or no—just let me do it this way.

I'd say that with the right hand, since we know that he had the adventitial scarring before, and he had been—you know, he had lived his whole life—we know he had adventitial scarring, we know that we released it and it was doing all right. And in between that, he was relatively closely monitored, and the only thing that he related that changed when he started having symptoms was going back to work.

So I think, based on that, my feeling is that certainly his return to work and whatever activity he was doing at work, whether it was related to a jackhammer, using his hands as a hammer, being struck by boards, whatever, contributed to the thrombosis following his initial injury.

The initial adventitial scarring could have been caused by work; it might not have been caused by work. It certainly is compatible with a compatible mechanism for repeated minor trauma which causes problems with the ulnar artery. But again, there is no direct cause and effect. You can't take one and say the other, without having seen him first.

My feeling is, medically, that it's — that probably it was related to his difficulty. Whether that fits legally or not, I don't know.

Q. (Mr. Yokley) When you say probably related to his difficulty, would you tell us what you mean by probably related?

THE WITNESS: By probably — medicine is not exact, in that repeated trauma, using a jackhammer, using your hand as a hammer, pounding, holding boards which bounce back as you strike them can — is certainly repeated trauma and is compatible in — in an individual to cause thrombosis or scarring of — of any artery. And the ulnar artery happens to be one which is more susceptible because of its anatomic location.

So, yes, there — it's possible that that — that could cause it. And my — and my feeling is that it — if it did not cause it, it certainly contributed and/or aggravated the condition, and I can't say that it caused it.

Now, in the case of the right hand, which was surgically examined — clinically examined before he returned to work and after he returned to work, unless there is something of which I'm not privileged that occurred outside of his work, he — my professional — my expert opinion is that trauma — that further trauma from the time of the first surgery until the time of his second surgery caused the re-thrombosis of the thrombosis of his right ulnar artery. And if the only trauma which he encountered was at work, then it's my opinion that work caused it. If there is trauma which can be demonstrated that occurred outside of work, then that would have contributed to it. But I don't have access to what he did 24 hours a day.

Q. (Mr. Yokley) Then may — may I couch the question in this form, then, Doctor?

Assuming that prior to becoming a construction worker and prior to using a jackhammer that Mr. Lumley had no numbness in either hand and had no symptoms as described to the medical people when he sought help, and assuming that he became engaged in the construction business as a

construction laborer; and assuming further, as a part of that job that he had, he repeatedly used his hands as a hammer and he repeatedly used a jackhammer; and assuming further, that for a period of about eight months prior to the surgery — first surgery that was performed that the symptoms, as described to you, had been in existence, and assuming your findings that you made in your examination of Mr. Lumley; assuming those facts, if the commissioner should so find, do you have an opinion to a reasonable medical certainty as to whether or not the repeated trauma by Mr. Lumley on the job could or might or probably caused the ulnar arterial thrombosis that you found?

. . . .

THE WITNESS: Okay. Yes, given the set of circumstances you described, with no problems and normal arteries before beginning work, the type of work that he did and the use of a jackhammer could cause ulnar artery thrombosis or adventitial scarring with decreased flow through the ulnar arteries.

This medical evidence, coupled with the testimony of the plaintiff, is sufficient to support the Commission's finding that the occupational disease was caused by plaintiff's employment with Dancy Construction Company.

The opinion and award of the Industrial Commission is

Affirmed.

Judges WELLS and PARKER concur.