The Full Commission has reviewed the Opinion and Award of Deputy Commissioner Garner based upon the record of the proceedings before Deputy Commissioner Garner and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioners denial of benefits and enters the following Opinion and Award.
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between employee-plaintiff and employer-defendant.
3. Travelers Property and Casualty was the carrier of workers compensation insurance for employer-defendant at all times relevant hereto.
4. Plaintiffs average weekly wage at the time of her alleged injury was $546.47, which yields a compensation rate of $364.33 per week.
5. A package of medical records submitted to the Deputy Commissioner and received into evidence.
 ***********
Based upon all of the competent evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. In June of 1989 plaintiff was hired by American Express to work in its card replacement department. In August 1996, plaintiffs right hand and wrist started to bother her, symptoms that led her to seek medical treatment that month. Plaintiff had not experienced any physical symptoms related to her right wrist or hand prior to beginning her position as a card replacement specialist.
2. Plaintiffs job at American Express required that she perform keying and data entry for 90% of the workday. In August of 1996, Plaintiffs right hand became symptomatic, because of dramatic changes in her workload, for what was later diagnosed as carpal tunnel syndrome. The dramatic changes in her workload constituted an unusual and unexpected or fortuitous occurrence and the resulting injury to her wrists qualifies as an injury by accident. Through August 1995, plaintiff used a computer system called Legacy, which was linked to an automated computer system called Pacer. With a few keystrokes on the Legacy/Pacer system, Plaintiff performed the steps necessary to do her job.
3. Plaintiff was asked to help install and run a new card replacement system in August and September 1995. The new system was called Triumph. The Triumph system required significantly more keying on a computer keyboard. Plaintiffs hours as well as the volume and pace of work increased significantly. It now took approximately 100 keystrokes (the total of the steps outlined by plaintiff) per card on the Triumph system to accomplish what had previously been performed on the old system in a few keystrokes. Because this was a new system, the entries also had to be made in the old Legacy system as backup in case the new system failed. The injuries she sustained because of this new system constituted both a compensable injury by accident and a compensable occupational disease.
4. Initially, plaintiff processed only 97 cards in the month of September 1995. During the month of August 1996, when plaintiffs right hand symptoms began, she processed 2,833 cards on the Triumph system. Because of the introduction of the new computer system plaintiff had to enter the same data necessary to process those 2,833 cards into the Legacy system.
5. Changes were also made to plaintiffs workstation in August 1996 that increased her right hand symptoms. A mouse and a flat mouse pad were added. Plaintiff used the mouse continuously eight or more hours per day. Her right hand remained in a static position and there was constant pressure of the right hand and wrist against the mouse and computer desk. These changes in the workstation and methodology and resulting wrist injury also constituted an unusual and unexpected or fortuitous occurrence and the resulting injury to her wrists qualifies as an injury by accident. The number of cards processed increased dramatically: In September 1996, 5,399 cards were processed; in October 1996, 7,086 cards were processed; and in November 1996, 6,648 cards were processed. Plaintiff began training an assistant in August 1996 to help with processing cards but plaintiff still processed more than 60% of all cards processed.
6. Plaintiff began to experience cramping, numbness and tingling in the fingers of her right hand in August 1996. Plaintiffs symptoms grew progressively worse until she sought medical treatment in October 1996. Constant use of the mouse, keying and the pressure of her wrist on her desk caused increased pain. Plaintiff reported her symptoms to her supervisor at or about the same time she sought medical treatment in October 1996. She was instructed to contact her employers workers compensation carrier.
7. Plaintiff initially went to her primary care physician, Dr. Isaac Newsome, on or about November 12, 1996. Dr. Newsome referred her to Dr. David V. Janeway for evaluation and treatment of carpal tunnel syndrome of the right hand. On November 21, 1996, plaintiff presented to Dr. Janeway complaining of pain in the right hand with occasional numbness and tingling. After examining plaintiff, Dr. Janeways impression was that plaintiff was suffering from carpal tunnel syndrome on the right. Splint therapy was attempted as a means to provide relief but it did not relieve plaintiffs symptoms, which progressed to a point where Dr. Janeway, her treating orthopaedic surgeon, took plaintiff out of work from June 3, 1997, through August 11, 1997. A positive Phalens test and a positive Tinels test indicated carpal tunnel syndrome. Nerve conduction studies were performed on or about January 7, 1997, and the results were normal.
8. On or about July 21, 1997, plaintiff was seen by Dr. Joseph Martin at Piedmont Anesthesia and Pain Consultants upon referral of Dr. Janeway. After examining plaintiff, Dr. Martin diagnoses plaintiff with repetitive motion injury, right hand (probable) and complex regional pain syndrome, Type I (possible). Plaintiff continued to be seen by Dr. Martin over the next several months, and on August 11, 1997, Dr. Martin indicated that plaintiff could return to work. On August 22, 1997, Dr. Martin indicated that plaintiff should reduce her work hours from nine (9) hours a day to five (5) hours per day.
9. On November 20, 1997 the defendant-employer performed an ergonomic evaluation of plaintiffs workstation that had been requested by Dr. Martin. The resulting report was stipulated into evidence. It shows that plaintiff performed a few specific tasks (1 or 2) repetitively. Plaintiff performed data entry for 90% of the day. This evaluation resulted in identification of risk factors for "repetitive stress injury. Changes were made in plaintiffs workstation, including moving the height of her PC drive, adjusting the arm supports on her chair, changing the mouse to a trac ball, switching the flat mouse pad to a gel pad and adding a gel pad for the keyboard.
10. Not being satisfied with the first ergonomic evaluation, on July 27, 1998, defendant-employer hired Alan C. Gorrod, a Certified Ergonomic Evaluation Specialist, to do a study. However, this study was severely flawed in at least two aspects: plaintiff was not allowed to show how she performed the job, and the conditions of learning a new computer system while keeping the old one updated were not duplicated. Additionally, Mr. Gorrod went to the job site on July 27, 1998 and observed a male employee for approximately 45 minutes to one hour. The male employee was in a different workstation using a different computer system to perform a different workload than that performed by plaintiff in 1996. The results and opinions from Mr. Gorrods later updated study are also not credible. The Full Commission assigns very little weight to Mr. Gorrods flawed analysis and resulting flawed opinions. Results from the ergonomic study of November 20, 1997 are more reliable.
12. Plaintiffs work at American Express caused her compensable injuries and the work placed her at an increased risk of developing her compensable injuries. Dr. Janeway based his final opinion on Mr. Gorrods flawed study. Therefore his earlier opinion that the work both caused the problem and the job increased the risk is given greater weight than his later opinions.
13. Dr. William J. Martin, a pain specialist in Winston-Salem to whom plaintiff was referred, also testified that plaintiffs work caused her injury and her work placed her at an increased risk. However, near the end of his testimony he was told that Dr. Janeway had an opposite opinion and he testified that he would defer to Dr. Janeway, the physician that had referred the business to him. The Full Commission finds the earlier clear, cogent and convincing portion of Dr. Martins testimony to be credible and gives very little weight to Dr. Martins testimony that he would defer to the flawed opinion of the physician who sent the patient to him.
14. On January 16, 1998, defendantemployer reclassified plaintiffs job status from fulltime to parttime as a result of her ongoing right hand problems. Because her hours are reduced to five hours a day, plaintiffs wages are reduced. Because of the work related injuries, plaintiff has lost part of her earning capacity. Plaintiff first became disabled from her injuries on June 3, 1997, when it caused her incapacity for work. She is entitled to temporary total disability from June 3, 1997, through August 11, 1997, and temporary partial disability from August 19, 1997, through the date of this Opinion and Award and continuing until 300 weeks from June 3, 1997 has occurred.
15. Plaintiff continues to experience symptoms in her right hand. Plaintiff has looked, unsuccessfully, for other work within American Express that does not involve repetitive use of her right hand. She remains at only five hours of work per day because of her occupational disease.
16. Plaintiff is entitled to medical treatment that has occurred and that will occur in the future as a result of her compensable injuries to the extent that the same was designed to effect a cure, lessen the period of disability or provide relief.
17. Defendants claim credit for disability payments from an employer-funded disability plan paid during periods when plaintiff was entitled to workers compensation disability benefits.
 ***********
Based upon the foregoing findings of fact, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff has presented sufficient evidence to demonstrate that her compensable injuries resulted from her employment with American Express. She has also demonstrated that her job put her at an increased risk of suffering those injuries. The criteria for identifying an occupational disease was set out in Rutledge v. Tultex Corporation, 308 N.C. 85,301 S.E.2d 359 (1983). For a disease to be compensable under G.S.9753(13), it must be: "(1) characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be `a causal connection between the disease and [claimants] employment. "A disease is `characteristic of a profession when there is a recognizable link between the nature of the job and an increased risk of contracting the disease in question. Booker v. DukeMedical Center, 297 N.C. 458, 472, 256 S.E.2d 189, 198 (1979). An occupational disease need not be one that originates exclusively from the particular kind of employment in which the employee is engaged. However, the conditions of that employment must result in a hazard that distinguishes that employment in character from the general run occupations. Lumley v. Dancy Construction Co., 79 N.C. App. 114, 199,339 S.E.2d 9, 13 (1986).
2. The third element of the Rutledge test is satisfied where plaintiffs employment "significantly contributed to, or was a significant causal factor in, the disease development. Rutledge, supra.
3. Little weight may be given to a physicians opinion that was based upon flawed information. "A physician, as an expert witness, may give his opinion, including a diagnosis, based either on personal knowledge or observation or on information supplied him by others, including the patient, if such information is inherently reliable. . . . (emphasis added) Ballenger v. Burris Industries, 66 N.C. App. 556, 563,311 S.E.2d 881, 885-886 (1984).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay to plaintiff, subject to attorneys fees and credit to defendant-employer set out below, compensation at the rate of $364.33 per week for those periods of time from June 3, 1997, through August 11, 1997. This amount has accrued and shall be paid in a lump sum with interest at 8% per year from the date of the hearing before the Deputy Commissioner until paid.
2. Defendants shall pay to plaintiff, subject to attorneys fees and credit to defendant-employer set out below, temporary partial disability from August 19, 1997, through the date of this Opinion and Award and continuing until 300 weeks from June 3, 1997 has occurred, at the rate of 2/3 of the difference between the wages paid and average weekly wages of $546.47. As much of this as has accrued to the date of this Opinion and Award shall be paid in a lump sum with interest at 8% per year from the date of the hearing before the Deputy Commissioner until paid. Defendants shall also pay a lump sum payment to plaintiff and 25% thereof to plaintiffs attorney necessary to begin making weekly payments on a current basis and shall thereafter make weekly payments on a current basis as they become due.
3. Defendants shall pay directly to plaintiffs attorney 25% of the compensation due plaintiff pursuant to paragraphs 1 and 2 of this Award.
4. Defendants are entitled to credit for any disability payments, dollar for dollar as a week for week offset, made to plaintiff from an employer-paid disability plan during periods when plaintiff was entitled to workers compensation disability payments.
5. Defendants shall pay for plaintiffs medical treatment that has occurred and that will occur in the future as a result of her compensable injuries to the extent that the same was designed to effect a cure, lessen the period of disability or provide relief. Such payments shall be in accordance with the Medical Fee Schedule of the North Carolina Industrial Commission.
6. Defendants shall pay the costs.
This 1st day of December 2000.
 S/___________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_________________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_________________ DIANNE C. SELLERS COMMISSIONER